OPINION
NIEMEYER, Circuit Judge:
In this case, we consider whether Virginia’s “Partial Birth Infanticide” Act, Va. Code Ann. § 18.2-71.1 (the ‘Virginia Act”), is facially unconstitutional.
After the Commonwealth of Virginia enacted the Virginia Act in April 2003, but before its July 1, 2003 effective date, Richmond Medical Center and its owner and medical director, Dr. William Fitzhugh (collectively, “Dr. Fitzhugh”), commenced this action to declare the Act unconstitutional and to enjoin its enforcement. The complaint alleged that the Act (1) impermissibly failed to include an exception for the preservation of the mother’s health, and (2) defined the term “partial birth infanticide” “so broadly as to ban the safest and most common second trimester method of abortion, the [standard] dilation and evacuation (“D & E”) method, and thus [to] impose an undue burden on the woman’s ability to choose abortion.”
The district court preliminarily enjoined enforcement of the Virginia Act and thereafter entered summary judgment in favor of Dr. Fitzhugh, declaring the Virginia Act unconstitutional on both grounds alleged by the plaintiffs and permanently enjoining its enforcement. Richmond Medical Center for Women v. Hicks, 301 F.Supp.2d 499, 512-18 (E.D.Va.2004). On appeal, we affirmed by a divided court, Richmond Medical Center for Women v. Hicks, 409 F.3d 619 (4th Cir.2005), and the Commonwealth filed a petition in the Supreme Court for a writ of certiorari.
While this case was pending in the Supreme Court, the Supreme Court decided Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), and held, in the face of similar constitutional challenges, that the federal partial-birth abortion statute, 18 U.S.C. § 1531 (the “Federal Act”), which is similar but not identical in language to the Virginia Act, was facially constitutional. Following its decision in Gonzales v. Carhart, the Supreme Court granted Virginia’s petition for a writ of certiorari in this case, vacated our judgment holding the Virginia Act unconstitutional, and remanded this case for reconsideration in light of Gonzales v. Carhart. See Herring v. Richmond Medical Center for Women, 550 U.S. 901, 127 S.Ct. 2094,167 L.Edüd 810 (2007).
On remand, relying on the distinction between the scienter language in the Federal Act and the scienter language in the Virginia Act, we again held the Virginia Act unconstitutional because it “imposes criminal liability on a doctor who sets out to perform a standard D & E that by accident becomes [a prohibited] intact D & E, thereby exposing all doctors who perform standard D & Es to prosecution, conviction, and imprisonment.” Richmond Medical Center for Women v. Herring, 527 F. 3d 128, 131 (4th Cir.2008) (emphasis added). On the Commonwealth’s motion, we voted to rehear this case en banc, thus vacating the three-judge panel decision. See Local Rule 35(c).
*169 We now conclude that insofar as Dr. Fitzhugh mounts a facial challenge against the Virginia Act, the challenge fails because (1) Dr. Fitzhugh’s posited circumstance does not present a sufficiently frequent circumstance to render the Virginia Act wholly unconstitutional for all circumstances; (2) the Virginia Act’s scienter language, although different from the Federal Act, nonetheless provides sufficient notice to a reasonable doctor of what conduct is prohibited by the statute; and (3) the provisions for a safe harbor and affirmative defenses, as well as the requirement of “an overt act,” ensure that the Virginia Act will not create a barrier to, or have a chilling effect on, a woman’s right to have a standard D & E or her physician’s ability to undertake that procedure without fear of criminal liability. Insofar as Dr. Fitzhugh purports to mount an as-applied challenge, we conclude that he has not presented sufficiently concrete circumstances in which the as-applied challenge can be resolved, recognizing that “[t]he Act is open to a proper as-applied challenge in a discrete case.” Gonzales v. Carhart, 550 U.S. at 168, 127 S.Ct. 1610. Accordingly, we reverse the judgment of the district court.
I
Effective July 1, 2003, Virginia enacted the “Partial Birth Infanticide” Act, which prohibits “kill[ing] a human infant” “who has been bom alive,” ie., who has been “completely or substantially expelled or extracted from its mother.” Va.Code Ann. § 18.2-71.1(A)-(C).[1]. ********X The Virginia Act provides that an infant is “substantially expelled or extracted from its mother” when its “entire head is outside the body of the mother” or, in a breech delivery, its “trunk past the navel is outside the body of the mother.” Id. § 18.2-71.1(D).[2] As distinct from this prohibited procedure, known as “intact D & E,” the Virginia Act excludes from its coverage numerous abortion procedures, including the “standard D & E,” ie., “the dilation and evacuation abortion procedure involving dismember *170 ment of the fetus prior to removal from the body of the mother.” Id. § 18.2-71.1(B); see also Gonzales v. Carhart, 550 U.S. at 134-36, 150, 127 S.Ct. 1610.
In his complaint challenging the Virginia Act, Dr. Fitzhugh alleged that “[bjecause of the Act’s breadth and vagueness, the Virginia Commonwealth’s Attorneys statewide may differ widely over what conduct they believe is proscribed by the Act. The Act thus subjects physicians to the risk of arbitrary and discriminatory prosecution.” He also pointed out that the Act does not permit a physician “to protect a woman from damage to her health” inasmuch as the statute only contains exception to protect the woman’s life. He summarized, “by prohibiting or severely restricting physicians from performing the most common, least expensive, and safest second trimester abortion procedures, the Act impermissibly restricts women’s ability to obtain abortions.”
The district court accepted Dr. Fitzhugh’s arguments and ruled that the Virginia Act was facially unconstitutional and enjoined its enforcement. 301 F.Supp.2d at 517. The court concluded that the Act is unconstitutional “because it fails to contain a health exception,” id. at 513, and because the Act “places an undue burden on women’s constitutional right to choose an abortion” by banning “pre-viability D & E’s” and by “causing] those who perform such D & E’s to fear prosecution, conviction and imprisonment,” id. at 515.
After the district court entered judgment and we affirmed, the Supreme Court decided Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480, rejecting similar challenges to the Federal Act, 18 U.S.C. § 1531. On remand of this case from the Supreme Court, Virginia and Dr. Fitzhugh filed supplemental briefs adjusting their arguments in light of Gonzales v. Carhart.
The record in this case shows that each year, Dr. Fitzhugh performs about 4,000 first-trimester abortions and about 225 second-trimester abortions. For second-trimester abortions, Dr. Fitzhugh usually uses the standard D & E method in which the mother’s cervix is dilated for 24 hours and then the fetus is evacuated from the mother in parts. As the Supreme Court explained in Gonzales v. Carhart, a doctor performing a standard D & E procedure can take from 10 to 15 passes through the uterus to remove all of the parts. See Gonzales v. Carhart, 550 U.S. at 150-51, 127 S.Ct. 1610. The Court distinguished the “standard D & E” from an “intact D & E” because in a standard D & E, “the doctor intends to remove the fetus in parts from the outset.” Id. at 151, 127 S.Ct. 1610 (emphasis added).
Dr. Fitzhugh testified that in his practice, between 75 to 85% of the second-trimester abortions he performs are standard D & E procedures. “Occasionally,” he might use other procedures. But “rarely” does a fetus emerge “intact” to the anatomical landmarks of the Federal and Virginia Acts. He estimated such an accidental emergence of the fetus occurs 10% of the time, but he was unable to cite any instance of the scenario occurring within the previous month or even the previous year. Even more rare, “less than one-half percent” of the time, according to Dr. Fitzhugh, the fetus emerges to the anatomical landmark up to its neck and its head becomes lodged in the woman’s cervix. In that circumstance, Dr. Fitzhugh crushes the fetal skull to remove the fetus, because otherwise, the “woman’s life would be at risk.” If an intact fetus emerged head first through the cervix, it would be delivered intact, and the Act would require that it not be deliberately destroyed. Dr. Fitzhugh explained, however, that in performing standard D & Es, he does not see *171 head-first deliveries of an intact fetus, presumably because his standard D & E procedure involves only 24 hours of dilation.
Describing his practice generally, Dr. Fitzhugh testified that he always intends to do the standard D & E procedure—in which the fetus is removed in parts. “Very rarely do you get a whole—you do get a whole fetus out sometimes, but that’s very rare.” But Dr. Fitzhugh contends that when he does receive an intact fetus, he “cannot know at the outset of a standard D & E procedure whether [the] prohibited procedure will result.” He asserts that if the Virginia Act were to take effect, “[his] only options would be to cease performing standard D & E procedures or to violate the Virginia Ban and then challenge its constitutionality in a criminal enforcement proceeding.”
II
Dr. Fitzhugh argues principally that the Virginia Act is facially unconstitutional because it imposes an undue burden on a woman’s ability to have an abortion using the standard D & E method. He asserts that the standard D & E method is the most common and safest method for a second-trimester abortion and that the Virginia Act, unlike the Federal Act, imposes criminal liability for the performance of an “accidental” intact D & E—ie., for “procedures that are intended to result in standard D & Es but inadvertently result in intact D & Es.” Because of the alleged facial deficiencies in the Virginia Act, Dr. Fitzhugh contends that the district court was correct in finding a complete invalidation of the Act. See Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328-30,126 S.Ct. 961, 163 L.Ed.2d 812 (2006).
Virginia contends that the district court erred in invalidating the statute on its face, arguing (1) that the district court should not have entertained a facial challenge alleging over-breadth in the abortion context; (2) that “abortion statutes must be construed to avoid constitutional problems”; and (3) that “if an abortion statute has some constitutional applications, it should not be invalidated in all applications.”
The Supreme Court has, as a policy matter, expressed a strong preference for avoiding facial challenges to statutes and has held, in the abortion context, that facial challenges should not be entertained except where the challenged statute “will operate as a substantial obstacle to a woman’s choice to undergo an abortion” “in a large fraction of the cases in which [the statute] is relevant.” Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The record in this case does not satisfy that standard as Dr. Fitzhugh does not demonstrate that the Virginia Act criminalizes standard D & Es that accidentally become intact D & Es “in a large fraction of the cases in which [the Virginia Act] is relevant.” Id. Additionally, the Virginia Act, while different from the Federal Act, which was upheld in Gonzales v. Carhart, nonetheless provides sufficient clarity as to what conduct is prohibited to enable a doctor of reasonable intelligence to avoid criminal liability. Accordingly, it does not impose an undue burden on a woman’s right to choose an abortion and is therefore constitutional. We address these points in order.
A
With increasing frequency, the Supreme Court has expressed caution about determining the constitutionality of statutes in the context of facial challenges. See, e.g., Washington State Grange v. Washington State Republican Party, — U.S. -, 128 S.Ct. 1184, 1191, 170 L.Ed.2d 151 *172 (2008) (noting that facial challenges rest on speculation, run contrary to the principles of judicial restraint, and threaten to short circuit the democratic process). But the concern about an Article III court’s role in addressing facial challenges to legislation, as distinct from as-applied challenges, has been debated from the beginning, as Mar-bury v. Madison implicitly recognized a dual role of courts, deriving from Article III. In Marbury, Chief Justice John Marshall stated that the courts are the ultimate interpreters of the Constitution responsible for declaring the supreme law of the land. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803). And where a legislature oversteps its bounds and issues a “law repugnant to the constitution,” it is void and must be struck down by the courts. Id.
Article III, however, extends the jurisdiction of courts only to cases and controversies, thus precluding courts from issuing advisory opinions or opining on constitutional issues not before the court. Thus, the most basic functions of the court as interpreter of the Constitution and the ultimate arbitrator of disputes exist in a tenuous balance meant to empower and simultaneously restrain the courts. See Richard H. Fallon, Jr., Mar-bury and the Constitutional Mind: Bicentennial Essay on the Wages of Doctrinal Tension, 91 Cal. L.Rev. 1, 34 (2003) (recognizing that “the tension between Marburg’s private-rights and special-functions faces emerges from even a cursory reflection on Marbury itself’). It is therefore not surprising that an apparent division has resulted between those cases in which constitutional challenges are mounted only to test a facial reading of the statute (“facial” challenges) and those cases in which constitutional challenges are mounted, based on a developed factual record and the application of a statute to a specific person (“as-applied” challenges).
The idea supporting facial challenges derives from the principle that “no one may be judged by an unconstitutional rule of law.” Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L.Rev. 235, 238 (1994). From that idea evolves the notion that courts can efficiently address constitutional concerns of a large group without engaging in the long and unwieldy process of case-by-case analyses. See id. at 277; see also David H. Gans, Strategic Facial Challenges, 85 B.U. L.Rev. 1333, 1352-53 (2005). And thus facial challenges are justified where as-applied adjudication is thought to be “inadequate to protect constitutional norms.” Gans, 85 B.U. L.Rev. at 1337.
But Article III most centrally requires that a court begin with a case, and usually a case involving concrete facts and allegations of harm caused by the defendant that can be redressed by the court.
The focus of concern must be whether the plaintiff is entitled to relief. To adjudicate a case, however, a court will invoke legal doctrine, typically as reflected in general rules, principles, or tests. Moreover, the application of doctrine—including the processes of reasoning necessary to resolve the dispute— will sometimes unmistakably, even necessarily, yield the conclusion that a statute is invalid, not merely as applied to the facts, but more generally or even in whole. In such cases, facial invalidation occurs as an outgrowth of as-applied adjudication.
Richard H. Fallon, Jr. As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L.Rev. 1321, 1337 (2000) (footnote omitted). But “[i]f a statute has valid applications and no harm occurs in using case-by-case adjudication, *173 facial invalidation seems gratuitous.” Gans, 85 B.U. L.Rev. at 1352.
Thus, slipping into the embrace of a facial challenge can tend to leave behind the limitations imposed by Article III and, indeed, to trample on legislative prerogatives, in violation of separation of powers principles. Moreover, as the Supreme Court has observed, “Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks.” Sabri v. United States, 541 U.S. 600, 608-09, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004).
Accordingly, the Supreme Court has, as a policy matter, expressed a strong preference for avoiding facial challenges. As the Court recently explained:
Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of “premature interpretation of statutes on the basis of factually barebones records.” Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither “ ‘anticipate a question of constitutional law in advance of the necessity of deciding it’ ” nor “ ‘formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.’ ” Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that “‘[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.’ ”
Washington State Grange, 128 S.Ct. at 1191 (citations omitted); see also Fallon, As-Applied and Facial Challenges, 113 Harv. L.Rev. at 1331 (noting that the Supreme Court prefers “fact-specific, case-by-case decisions” because “full specification of the statute’s meaning require[s] a series of judgments concerning the extent to which it should be read literally or purposively (for example, to avoid constitutional difficulties) and how it would apply to the gamut of imaginable fact situations”); id. at 1368 (noting that “the full meaning of a statute frequently is not obvious on the occasion of its first application”).
The proper implementation of the Supreme Court’s policy preference, however, has not been governed by well defined criteria. Because a facial challenge can result in finding an act wholly invalid, the Court has observed that the act cannot be found facially unconstitutional if it operates constitutionally in some circumstances. See United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Thus the Court announced that “the [facial] challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [challenged] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.” Id. Yet when the Court considered a facial challenge to Pennsylvania’s Abortion Control Act, it applied a somewhat different standard, without mentioning Salerno, stating that because “in a large fraction of the cases,” the Pennsylvania statute “will operate as a substantial obstacle to a woman’s choice to undergo an abortion,” the statute is facially invalid. Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). But after Casey, the Court again considered, in a more complete analysis, the appropriate circumstances under which a *174 court should entertain a facial challenge to a statute:
Under United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), a plaintiff can only succeed in a facial challenge by “establish[ing] that no set of circumstances exists under which the Act would be valid,” i.e., that the law is unconstitutional in all of its applications. While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a “ ‘plainly legitimate sweep.’ ”
Washington State Grange, 128 S.Ct. at 1190 (alteration in original) (citations omitted); see also Crawford v. Marion County Election Bd., — U.S. -, 128 S.Ct. 1610, 1623, 170 L.Ed.2d 574 (2008) (Stevens, J., plurality opinion) (reciting the standard that a statute must lack “a plainly legitimate sweep”).
Urging us to apply the “no set of circumstances” or the “plainly legitimate sweep” standard, the Commonwealth of Virginia contends in its brief that the difference between the two is more theoretical than substantive—resting on a difference between “always unconstitutional and almost always unconstitutional.” We need not, however, attempt to resolve the uncertainty regarding the appropriate criteria for entertaining facial challenges in this case, because, as we explain, Dr. Fitzhugh cannot successfully mount a facial challenge to the Virginia Act even under the more relaxed “large fraction of the cases” test applied in Casey.
B
Under the Casey standard, Dr. Fitzhugh must show that the Virginia Act is unconstitutional in criminalizing standard D & Es that accidentally become intact D & Es “in a large fraction of the cases in which [the Virginia Act] is relevant.” Casey, 505 U.S. at 895, 112 S.Ct. 2791. This showing is not sufficiently supported by the record. As the Supreme Court has stated, an intact D & E is almost always a conscious choice and almost never accidental:
The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. And intact D & E is usually described as involving some manner of serial dilation.[3] Doctors who do not seek to obtain this serial dilation perform an intact D & E on far fewer occasions. See, e.g., Carhart, 331 F.Supp.2d, at 857-858 (“In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of laminaria”). This evidence belies any claim that a standard D & E cannot be performed without intending or foreseeing an intact D & E.
Gonzales v. Carhart, 550 U.S. at 155, 127 S.Ct. 1610 (emphasis added) (citations omitted).
The medical evidence in this case is nearly identical to that presented in Gonzales v. Carhart, where Dr. Fitzhugh was also a plaintiff and presented similar evidence. The record in this case reveals that generally, standard D & Es represent 96% of abortions after the first-trimester, and Dr. Fitzhugh testified that in his practice, standard D & Es represent 75 to 85% of his second-trimester abortions. Thus the vast majority of the procedures for *175 performing second-trimester abortions involves standard D & Es in which doctors initiate dilation of the cervix and, after a day or a day and a half, remove the fetus from the uterus in parts. In virtually every case where the head of the fetus emerges first, the doctor must crush the skull and thereafter remove the fetus in parts because the dilation is generally not sufficient to permit the head to pass. In cases involving a breech position, the doctors proceed similarly, removing the fetus in parts. Dr. Fitzhugh testified that in less than 0.5% of the cases, a fetus is presented in a breech position and accidentally emerges intact up to its head, at which point the head becomes lodged in the cervix. In those rare cases, Dr. Fitzhugh crushes the skull and completes the delivery. He testified that not doing so would risk the life of the mother.
It is the rare circumstance when the fetus in breech position emerges intact to its navel on which Dr. Fitzhugh relies to mount a facial challenge to the Virginia Act prohibiting the knowing performance of an intact D & E. But Gonzales v. Car-hart requires that we evaluate the constitutionality of the Act and appropriateness of the facial challenge based on “all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications.” 550 U.S. at 168, 127 S.Ct. 1610. As the Court explained:
It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. [I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.
Id. (alteration in original) (internal quotation marks omitted).
Yet, even in that rare circumstance identified by Dr. Fitzhugh, he need not violate the Virginia Act. Dr. Charles deProsse, Dr. Fitzhugh’s expert witness, stated that when the fetus appears at the cervix head first and passes the anatomical landmarks, there is never a need to perform an overt act to kill it, as it can simply be removed from the woman intact. And in the rare event that the fetus appears at the cervix in breech position and its skull becomes lodged in the cervix, the woman’s life is in danger, as Dr. Fitzhugh testified, and the doctor may take any step within reasonable medical judgment that is necessary to prevent the mother’s death. See Va.Code, § 18.2-71.1(E).[4]
As a result, there is little or no evidence in the record suggesting the inevitability of the “accidental” intact D & E abortion that would violate the Virginia Act, and to the extent that such a circumstance might arise in a rare case, the doctor has adequate alternatives so as to preclude a finding on a facial challenge that the statute is unconstitutional in “a large fraction” of the cases in which it is relevant. To hold the Virginia Act facially unconstitutional for all circumstances based on the possible rare circumstance presented by Dr. Fitzhugh is not appropriate under any standard for facial challenges.
C
Moreover, the Virginia Act, even though somewhat different from the Federal Act, *176 nonetheless provides sufficient clarity as to what conduct is prohibited to enable a doctor of reasonable intelligence to avoid criminal liability under it, and therefore the Virginia Act is constitutional.
The Federal Act applies to any physician who “knowingly[,] ... deliberately and intentionally vaginally delivers a living fetus ... for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus,” and who “performs the overt act.” 18 U.S.C. § 1531(a), (b). In Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), the Supreme Court upheld the Federal Act in part because it “requires the doctor deliberately to have delivered the fetus to an anatomical landmark,” such that the doctor “will not face criminal liability if he or she delivers a fetus beyond the prohibited point by mistake.” Id at 149, 127 S.Ct. 1610. If a doctor intends to perform a standard D & E and “intends to remove the fetus in parts from the outset, the doctor will not have the requisite intent to incur criminal liability” under the Federal Act. Id at 151, 127 S.Ct. 1610; see also id at 155, 127 S.Ct. 1610 (“If a doctor’s intent at the outset is to perform a D & E in which the fetus would not be delivered to either of the Act’s anatomical landmarks, but the fetus nonetheless is delivered past one of those points, the requisite and prohibited scienter is not present”). Thus, the Court in Gonzales v. Carhart found that the Federal Act’s intent requirements “preclude liability from attaching to an accidental intact D & E,” id at 155, 127 S.Ct. 1610, because “[i]f a living fetus is delivered past the critical point by accident or inadvertence, the Act is inapplicable.” Id at 148, 127 S.Ct. 1610.
In contrast to the Federal Act, the language of the Virginia Act does not preclude such liability. Virginia Code § 18.2-71.1 applies to any person who “knowingly performs ... any deliberate act that ... is intended to kill a human infant” that has “been completely or substantially expelled or extracted from its mother.” Va.Code § 18.2-71.1(A)-(C). Unlike the Federal Act, which defines “partial-birth abortion” as “deliberately and intentionally” delivering “a living fetus ... for the purpose of performing] an overt act” that kills it, 18 U.S.C. § 1531(a)-(b), the Virginia Act’s scienter requirement does not attach to the delivery of the fetus. Rather, the Virginia Act’s scienter requirement targets the “deliberate act” that kills “a human infant who has been born alive,” Va.Code § 18.2-71.1(B). Whether the fetus is intentionally vaginally delivered or accidentally vaginally delivered is of no consequence. The Virginia Act’s scienter is measured only after partial delivery of the “human infant who has been born alive” and not at the commencement of the abortion procedure, as under 18 U.S.C. § 1531. Because there is no “human infant who has been born alive” at the outset of any D & E procedure, whether standard or intact, the doctor’s intent before commencing the D & E procedure is not determinative of scienter for purposes of criminal liability under the Virginia Act. The Virginia Act applies with equal force to a doctor who intends to perform a prohibited intact D & E procedure, intentionally extracts the fetus past an anatomical landmark, and then performs a “deliberate act” to kill the fetus, and to a doctor who intends to perform a permissible standard D & E procedure, accidentally extracts the fetus past an anatomical landmark, and then performs a deliberate act to kill the fetus and complete the abortion. In either event, however, we read the Virginia Act intent requirement to require purpose, not mere knowledge, that a specific act—taken after emergence to the anatomical landmark— will result in fetal demise. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & *177 Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (“[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality” (internal citation and quotation marks omitted)). Thus, the Virginia Act criminalizes both the intentional intact D & E and the accidental intact D & E, but only where the necessary scienter is present and no affirmative defense is presented.
Despite the fact that the Virginia Act is broader in scope than the federal statute, covering accidental intact D & Es, it is neither unconstitutionally vague nor unduly burdensome. The Virginia Act sufficiently cabins the narrow set of situations in which a doctor could incur criminal liability and therefore does not impermissibly chill the performance of allowed procedures. The Court in Gonzales v. Carhart clearly enunciates the standard a statute must meet so as not to be unconstitutionally vague:
The [federal] Act provides doctors “of ordinary intelligence a reasonable opportunity to know what is prohibited.” Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Indeed, it sets forth “relatively clear guidelines as to prohibited conduct” and provides “objective criteria” to evaluate whether a doctor has performed a prohibited procedure. Posters ‘N’ Things[, Ltd. v. United States, 511 U.S. 513,] 525-26[, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) ]. Unlike the statutory language in Stenberg[ v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ], that prohibited the delivery of a “‘substantial portion’” of the fetus—where a doctor might question how much of the fetus is a substantial portion—the Act defines the line between potentially criminal conduct on the one hand and lawful abortion on the other. Stenberg, 530 U.S. at 922, 120 S.Ct. 2597 (quoting Neb.Rev.Stat. Ann. § 28-326(9) (Supp.1999)). Doctors performing D & E will know that if they do not deliver a living fetus to an anatomical landmark they will not face criminal liability.
550 U.S. at 149, 127 S.Ct. 1610.[5] Doctors, knowing when and how they might incur liability, need not be inhibited from performing permissible standard D & E procedures because the Virginia Act is plain as to how that liability may be avoided.
In the circumstances where a standard D & E results in a full, intact birth, the Virginia Act makes clear that a doctor will incur liability only if the doctor performs any deliberate act “intended to kill” the fetus that has just been completely expelled from the mother. Nothing in the record or the Act supports any doubt as to the actions a doctor may or may not take to avoid criminal liability if a complete expulsion of the fetus occurs.
The circumstance of a partial expulsion of a fetus from the mother presents a more complicated scenario under the language of the Virginia Act. But this scenario does not create any constitutional infirmity because the Act exempts a doctor from liability if the mother’s life is in danger and makes clear to the doctor the *178 permissible avenues for avoiding criminal liability. The record shows that in approximately 10% of standard D & E procedures, the fetus accidentally emerges intact to an anatomical landmark but is not completely expelled, sometimes because the fetus’s head has become lodged in the cervix. But the record also shows that this situation will almost always endanger the mother’s life. Although the Virginia Act ostensibly prohibits a doctor from taking a deliberate act intended to kill the fetus at this point in the abortion procedure—when the doctor is faced with an accidental intact D & E—the Act also allows the doctor to take reasonably necessary medical steps to preserve the mother’s life. If the mother’s life is in danger, the doctor may use “any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant.” Va.Code § 18.2-71.1(E). Therefore, when the mother’s life is at risk, as the record reflects is the case in the majority of such instances, the doctor may complete the D & E procedure in these cases to save the mother’s life. In doing so, the doctor has an unequivocal affirmative defense to any criminal liability under the Virginia Act.
Finally, in the rare circumstance where the mother’s life is not in danger and the fetus has been partially expelled to an anatomical landmark, the statute clearly prohibits the doctor from completing the abortion by taking a deliberate act to kill the fetus. In this circumstance, however, with the fetus at least partially expelled from the mother’s body, the State’s recognized interest in the life of the fetus must be counterbalanced against the mother’s right to an abortion. See Gonzales v. Carhart, 550 U.S. at 157-58, 127 S.Ct. 1610 (reaffirming that the State’s “regulatory interest in protecting the life of a fetus” must “coexist” with a woman’s right to have a pre-viability abortion without undue interference from the State). The Virginia Act reflects the State’s legitimate interest in preserving the life of the fetus in this situation by allowing the doctor to attempt to safely complete delivery of the fetus. See Va.Code § 18.2-71.1(B). As long as the doctor takes no deliberate act intending to terminate the fetus’s life, the Virginia Act shields the doctor from liability, even if the fetus dies during the delivery.[6] Moreover, if complications develop during delivery endangering the mother’s life, the exception in § 18.2-71.1(E) would again apply. The statute makes clear when a doctor would incur liability in the event of delivery to an anatomical landmark, but also provides clear protocols for access to immunity for the physician.
Thus, Dr. Fitzhugh’s concern that a doctor could incur liability under the Virginia Act for performing any act that ultimately kills the fetus, regardless of whether the doctor intends to kill the fetus or not, is unfounded. The Virginia Act, like the Federal Act, makes a clear distinction between the acts necessary to deliver the fetus and the prohibited overt acts that destroy the fetus—a distinction found important in Gonzales v. Carhart. See 550 U.S. at 153, 127 S.Ct. 1610 (“This distinc *179 tion matters because, unlike intact D & E, standard D & E does not involve a delivery followed by a fatal act”).
In the Virginia Act, a partial birth infanticide is defined as a “deliberate act that is intended to kill a human infant who has been bom alive.” Va.Code Ann. § 18.2-71.1(B) (emphasis added). The use of the present perfect tense indicates that the live birth, as defined in subsection (C) of the Virginia Act, must have taken place prior to the “deliberate act” that kills the fetus. Thus, the act that results in the demise and the emergence to the anatomical landmark cannot be one single action. Additionally, if the doctor acts to complete delivery, § 18.2-71.1(B) shields the doctor from liability, even if the doctor’s acts ultimately kill the fetus. Likewise, if the doctor acts to prevent the death of the mother, § 18.2-71.1(E) also shields the doctor from liability if the doctor takes medically reasonable steps to preserve the life and health of the fetus, even if the doctor’s acts ultimately kill the fetus. By its plain language, the statute provides for the distinction—between acts “intended to kill the fetus.” Va.Code § 18.2-71.1(B), and acts performed to complete delivery or to prevent the death of the mother—that Dr. Fitzhugh argues is necessary to avoid vagueness or a chilling effect.
Moreover, the Supreme Court noted in Gonzales v. Carhart that “[t]he law need not give abortion doctors unfettered choice in the course of their medical practice,” 550 U.S. at 163,127 S.Ct. 1610:
The government may use its voice and its regulatory authority to show its profound respect for the life within the woman ... Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.
Id. at 157-58, 127 S.Ct. 1610. Thus, in the rare circumstance where the fetus is partially expelled from the mother and the mother’s life is not in danger, the Virginia Act clearly delineates when a doctor will incur liability, while, at the same time, extending protection to a fetus’s life. This limited circumstance creates no barrier to, or chilling effect on, a woman’s right to have a standard D & E or her physician’s ability to undertake that procedure without fear of criminal liability.
D
In short, the posited rare circumstance where a fetus accidentally emerges to an anatomical landmark intact and alive and its head then becomes lodged in the cervix has been noted by the Supreme Court to occur rarely, if ever—a fact supported also in the record here—and this fact makes a facial challenge on this basis improper. The possibility of this rare circumstance certainly does not justify rendering invalid the Virginia Act for all other circumstances.
Additionally, while the Virginia Act has a broader scope than the Federal Act, the Virginia Act is nonetheless constitutional. The Act clearly delineates the rare circumstances in which a doctor will incur liability, thus enabling a doctor to perform a standard D & E without fear that accidental emergence of the fetus to an anatomical landmark will present a Morton’s fork, where the doctor must choose between criminal liability or care that the doctor believes is not in the best interest of the patient.
For these reasons, we reject Dr. Fitzhugh’s facial challenge of the Virginia Act.
*180 III
In addition to mounting a facial challenge to the Virginia Act, Dr. Fitzhugh contends that he is mounting an as-applied challenge, although the Virginia Act has never been applied, nor threatened to be applied, to anyone and the record contains no concrete factual circumstance to which Dr. Fitzhugh can claim the Act applies unconstitutionally. He has not indicated that he has any particular patient in mind, nor any discrete factual circumstance that is detailed by medical records or other similarly concrete evidence. Moreover, Dr. Fitzhugh has testified generally that the circumstances in each of his cases are unique, and he cannot determine as a general matter how the Virginia Act might apply. As he testified:
Like other physicians, I decide how to remove the fetus during a particular abortion procedure based on the clinical situation, the condition of the cervix and the uterus, the presentation and size of the fetus, the overall health of the patient, and other medical factors.
This record does not present the concrete facts necessary to create a live case or controversy so as to be able to show “that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the [Virginia] Act must be used.” Gonzales v. Carhart, 550 U.S. at 167, 127 S.Ct. 1610.
We have resolved Dr. Fitzhugh’s facial constitutional challenges to the Virginia Act—challenges that might be assertable not only by him but also by others in his situation. But to go further and find the Virginia Act unconstitutional in particular factual circumstances requires a more complete and readily identifiable set of facts that can be evaluated and therefore that draws on a more nuanced application of the Virginia Act. We conclude that in this case, with its record, an as-applied challenge cannot be addressed.
For the reasons given, the judgment of the district court is REVERSED.

. The text of these provisions read:
A. Any person who knowingly performs partial birth infanticide and thereby kills a human infant is guilty of a Class 4 felony. B. For the purposes of this section, "partial birth infanticide " means any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed. The term "partial birth infanticide " shall not under any circumstances be construed to include any of the following procedures: (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother, or (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.
C. For the purposes of this section, "human infant who has been bom alive ” means a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.
Va.Code Ann. § 18.2-71.1(A)-(C).

. The text of this provision reads:
D. For purposes of this section, "substantially expelled or extracted from its mother" means, in the case of a headfirst presentation, the infant's entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant's trunk past the navel is outside the body of the mother.
Va.Code Ann. § 18.2-71.1(D).

. The Supreme Court earlier described "serial dilation”: "Doctors who attempt at the outset to perform intact D & E may dilate for two full days or use up to 25 osmotic dilators.” Gonzales v. Carhart, 550 U.S. at 137, 127 S.Ct. 1610 (emphasis added).

. The dissent argues that "this simply cannot be the purpose of the life exception" as it would “cancel out” the Virginia Act's prohibition against killing the fetus. Post at 193-94. Such an observation, however, overlooks the fact that even according to Dr. Fitzhugh, the circumstance when the head of a fetus delivered in breech position becomes lodged and thereby risks the mother's life is “rare.” The Virginia Act’s prohibition applies, of course, to the vast majority of other cases where the mother's life is not at risk.

. While the dissent argues that the Supreme Court “upheld the federal statute based on its requirement that a doctor intend at the outset to perform an intact D & E,” post at 184 (emphasis omitted), Gonzales v. Carhart actually notes that this intent-at-the-outset requirement merely buttressed the holding that the Federal Act gave notice to doctors of reasonable intelligence of what was prohibited. As we have pointed out, the imposition of the intent requirement at a point after the fetus has been expelled to the anatomical landmark, as contained in the Virginia Act, still provides this notice.

. "The term 'partial birth infanticide' shall not under any circumstances be construed to include any of the following procedures: ... (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.” Va.Code § 18.2-71.1(B). While the dissent argues that "[a]ny act taken [after expulsion to the anatomical landmark] that causes fetal demise is a deliberate act that violates the Virginia Act,” post at 192, the Virginia Act is not so broad and makes clear that the doctor must intend that the act result in fetal demise.