**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BETTY J. OSTERGREN,

*Plaintiff-Appellee,*

v.

KENNETH T. CUCCINELLI, II, in his
official capacity as Attorney
General of Virginia,

*Defendant-Appellant.*

No. 09-1723

ELECTRONIC PRIVACY INFORMATION
CENTER,

*Amicus Supporting Appellee.*

BETTY J. OSTERGREN,

*Plaintiff-Appellant,*

v.

KENNETH T. CUCCINELLI, II, in his
official capacity as Attorney
General of Virginia,

*Defendant-Appellee.*

No. 09-1796

ELECTRONIC PRIVACY INFORMATION
CENTER,

*Amicus Supporting Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:08-cv-00362-REP)

Argued: March 23, 2010

Decided: July 26, 2010

Before DUNCAN and DAVIS, Circuit Judges, and
Joseph R. GOODWIN, Chief United States District Judge
for the Southern District of West Virginia,
sitting by designation.

---

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Duncan wrote the opinion, in which Judge
Davis and Judge Goodwin concurred. Judge Davis wrote a
separate concurring opinion.

---

## COUNSEL

**ARGUED**: Earle Duncan Getchell, Jr., OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant/Cross-Appellee. Rebecca Kim Glenberg,
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF VIRGINIA, Richmond, Virginia, for Appellee/Cross-
Appellant. **ON BRIEF:** William C. Mims, Attorney General
of Virginia, Stephen R. McCullough, State Solicitor General,
William E. Thro, Special Counsel, Martin L. Kent, Chief
Deputy Attorney General, Stephen M. Hall, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF
VIRGINIA, Richmond, Virginia, for Appellant/Cross-
Appellee. Frank M. Feibelman, Cooperating Attorney, ACLU
OF VIRGINIA, Richmond, Virginia, for Appellee/Cross-

Appellant. Marc Rotenberg, John Verdi, Jared Kaprove, Matthew Phillips, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amicus Supporting Appellee/Cross-Appellant.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises from a First Amendment challenge to Virginia's Personal Information Privacy Act, Va. Code §§ 59.1-442 to -444. Section 59.1-443.2 prohibits "[i]ntentionally communicat[ing] another individual's social security number to the general public." The district court found this section unconstitutional as applied to an advocacy website that criticized Virginia's release of private information and showed publicly available Virginia land records containing unredacted Social Security numbers ("SSNs"). *Ostergren v. McDonnell*, No. 08-362, 2008 WL 3895593, at *14 (E.D. Va. Aug. 22, 2008). Later, the court entered a permanent injunction barring Virginia from punishing the republication of "publicly obtainable documents containing unredacted SSNs of Virginia legislators, Virginia Executive Officers or Clerks of Court as part as [sic] an effort to reform Virginia law and practice respecting the publication of SSNs online." *Ostergren v. McDonnell*, 643 F. Supp. 2d 758, 770 (E.D. Va. 2009). Both decisions are challenged on appeal. For the reasons that follow, we affirm in part and reverse in part.

I.

Betty Ostergren resides in Hanover County, Virginia, and advocates for information privacy across the country. Calling attention to Virginia's practice of placing land records on the Internet without first redacting SSNs, she displayed copies of Virginia land records containing unredacted SSNs on her

website. After section 59.1-443.2 was amended to prohibit this practice, but before the amendment took effect in July 2008, Ostergren brought this constitutional challenge.[1]

## A.

The clerk of court for each county in Virginia maintains documents affecting real property within the county. These "land records" reflect the ownership, conveyance, encumbrance, or financing of real property.[2] They include deeds, contracts, liens, divorce decrees, and various other documents. *See* Va. Code § 17.1-227. Virginia law requires that clerks make land records available for public inspection. *See* Va. Code § 17.1-208. Any person can review and copy land records by visiting the courthouse and requesting them.

During the 1990s, many clerks of court began placing land records on the Internet. According to counsel for the Attorney General, the impetus came mainly from the real estate industry because online access to land records facilitated numerous real estate transactions. The Virginia General Assembly encouraged this practice by allowing clerks to charge a fee for online access. *See* Va. Code § 17.1-276. The General Assembly later established a "Technology Trust Fund Fee" assessed for every document recorded, and set aside the revenue for

---

[1]We provide factual background primarily through July 2008. Regarding the district court's decision finding section 59.1-443.2 unconstitutional, we cannot consider later factual developments because the record below did not extend beyond July 2008. *See Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 384 (4th Cir. 2000) ("From a procedural standpoint, courts hearing a case on appeal are limited to reviewing the record that has been developed below."). Regarding injunctive relief, we could theoretically have considered factual background through June 2009, but the record below contains little evidence about factual developments after July 2008.

[2]Virginia law states that "'[l]and records' means any writing authorized by law to be recorded on paper or in electronic format that the clerk records affecting title to real property . . . ." Va. Code § 17.1-292(B).

improving access to public records through information technology. *See* Va. Code § 17.1-279. The General Assembly also declared "the intent . . . that all circuit court clerks provide secure remote access to land records on or before July 1, 2006." 2004 Va. Acts 980. Finally, in 2007, the General Assembly imposed guidelines for posting land records online, *see* Va. Code § 17.1-294, and required that "[e]very circuit court clerk shall provide secure remote access to land records . . . on or before July 1, 2008," Va. Code § 17.1-279(D)(3).

The parties stipulated that "[u]nder Virginia's 'secure remote access' system, any person may, for a nominal fee, obtain online access to all of the land records for a given locality." J.A. 86. Guidelines require that an individual must register and obtain a username and password before using the system. *See* Information Technology Resource Management Standard, SEC503-02 §§ 1.4(3), 2.1 (Va. Info. Techs. Agency Mar. 28, 2005). This involves signing an agreement, paying a fee (possibly several hundred dollars per year), and providing certain personal information (first and last names, business name, mailing address, telephone number, email address, and citizenship status). *Id.* § 2.1.1. "Registration must be in person or by means of a notarized or otherwise sworn application that establishes the prospective Subscriber's identity, business or residence address, and citizenship status." *Id.* § 2.1.2.

By July 2008, every county in Virginia had made its land records available on the Internet through secure remote access. This included over 200 million Virginia land records.

### B.

Virginia's decision to place land records online raised certain concerns about information privacy. For many decades, attorneys included SSNs on real estate documents submitted for recording. Initially assigned for the purpose of administering Social Security laws, nine-digit SSNs have become

widely used for identification and account authentication by government agencies and private organizations because no two people have the same number. They are thus highly susceptible to misuse. An unscrupulous individual who knows another's SSN could, for example, obtain fraudulent credit cards or order new checks on that person's account.

When clerks of court began placing land records online, they did nothing to redact SSNs. At that time, Virginia law neither required such redaction nor prevented attorneys from submitting documents for recording that contained unredacted SSNs. In 2003 and 2004, however, the General Assembly provided that "clerk[s] may refuse to accept any instrument submitted for recordation that includes a grantor's, grantee's or trustee's social security number," and clarified that "the attorney or party who prepares or submits the instrument has responsibility for ensuring that the social security number is removed from the instrument prior to the instrument being submitted for recordation." Va. Code § 17.1-227. Virginia law also provides that clerks "shall be immune from suit arising from any acts or omissions relating to providing secure remote access to land records pursuant to this section unless the clerk was grossly negligent or engaged in willful misconduct." Va. Code § 17.1-294(D).

The General Assembly finally addressed redaction in the 2007 legislation mandating that clerks provide secure remote access by July 1, 2008. *See* Va. Code § 17.1-279(D)(3). The General Assembly noted clerks' authority to redact SSNs from digital land records available through secure remote access, authorized hiring private vendors to run redaction software, and authorized using Technology Trust Fund money for this purpose. *See* Va. Code § 17.1-279. The legislation would have also required clerks to complete the redaction process by July 1, 2010, but this provision never went into effect because the General Assembly failed to appropriate the necessary funds. *See* 2007 Va. Acts 872; 2007 Va. Acts 748. These efforts focused solely on digital land records available

online. Virginia does not redact SSNs from original land records maintained at local courthouses even though Virginia law requires that such records remain publicly accessible.

The redaction process involves two steps—one electronic, the other manual. First, computer software checks digital land records and, in essence, labels each document "SSN found," "SSN probably found," "SSN possibly found," and "SSN not found." Individuals then manually review all but the last category, which they randomly sample. According to stipulation,

> The accuracy of the redaction methods used by the circuit court clerks with regard to images that actually have social security numbers is between 95% and 99%. After redaction, a social security number that remains un-redacted in the online land records will be redacted if the Clerk is informed of the inaccuracy. If not brought to the Clerk's attention, it will remain accessible in the online land records.

J.A. 230. One company, Computing System Innovations ("CSI"), handled redaction for 67 counties. In processing about 50 million images, CSI manually reviewed about 5 million and discovered that 1,575,422 (about 3.21%) contained SSNs.[3]

By July 2008, 105 of Virginia's 120 counties reported that they had completed the redaction process. Among the 15 that remained, two planned to finish by July 2010 and the rest planned to finish by December 2009. Despite the incomplete redaction, these 15 counties nonetheless continued to make their land records available online through secure remote access.

---

[3]Ostergren testified that on July 15, 2008, after Hanover County purportedly finished redacting SSNs, she successfully located Hanover County land records containing unredacted SSNs through secure remote access.

## C.

When Virginia clerks of court started placing land records containing unredacted SSNs online, Ostergren began lobbying the General Assembly in opposition and contacting individuals whose SSNs were compromised. She has engaged in similar advocacy across the country, but such advocacy alone met with little success. Ostergren created her website www.TheVirginiaWatchdog.com in 2003 and, two years later, began posting copies of public records containing unredacted SSNs obtained from government websites. Since then, Ostergren has posted numerous Virginia land records showing SSNs that she herself obtained through Virginia's secure remote access website. For example, she explained that searching for the term "Internal Revenue Service," "Department of Justice," or "United States" produces thousands of federal tax liens, and all those filed before 2006 contain SSNs.

In posting records online, Ostergren seeks to publicize her message that governments are mishandling SSNs and generate pressure for reform.[4] She explained that "seeing a document containing an SSN posted on my website makes a viewer understand instantly, at a gut level, why it is so important to prevent the government from making this information available on line [sic]." J.A. 89. She added that merely explaining the problem lacks even "one-tenth the emotional impact that is conveyed by the document itself, posted on the website." J.A. 89. Perhaps for this reason, Ostergren received considerable media attention when she began posting records online. Furthermore, many government agencies outside Virginia responded by removing public records from the Internet or redacting private information.

---

[4]Normally Ostergren reveals only public officials' SSNs, reasoning that they are "the people who have the influence to address the problem." J.A. 89. She explained, however, that in June 2008 the clerk of court for Pulaski County, Arkansas, refused to remove land records from the Internet pending SSN redaction until Ostergren published land records that showed several prominent local citizens' SSNs.

Despite this success, Ostergren's website has also contributed to the underlying social concern that motivates her advocacy. Because one can visit her website and find public records showing SSNs without needing to register or input search terms, Ostergren makes Virginia land records showing SSNs more accessible to the public than they are through Virginia's secure remote access system. Potential wrongdoers not experienced or motivated enough to register for secure remote access might nonetheless stumble upon Ostergren's website and obtain SSNs. Indeed, one person has pleaded guilty to using Ostergren's website to obtain fraudulent credit cards.

## D.

The controversy that spurred this case arose from Ostergren's disclosure of others' SSNs printed in Virginia land records that she posted online. Section 59.1-443.2 of the Code of Virginia provides that "a person shall not . . . [i]ntentionally communicate another individual's social security number to the general public." Va. Code § 59.1-443.2(A)(1). In Spring 2008, the General Assembly removed a statutory exception for "records required by law to be open to the public."[5] 2008 Va. Acts 837. The Attorney General of Virginia later indicated that, after this change took effect on July 1, 2008, Ostergren would be prosecuted under section 59.1-443.2 for publicly disseminating Virginia land records containing unredacted SSNs.[6]

---

[5]Ostergren alleges that the General Assembly made this change "in direct response to [her] website." J.A. 10.

[6]For a section 59.1-443.2 violation, the Attorney General may seek various civil penalties, including fines and injunctions. *See* Va. Code §§ 59.1-201 to -206. Furthermore, "[a]ny person who suffers loss as the result of a violation" may "initiate an action to recover actual damages, or $500, whichever is greater," or for a willful violation, "an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater," plus "reasonable attorneys' fees and court costs." Va. Code § 59.1-204.

On June 11, 2008, Ostergren brought this action in the Eastern District of Virginia under 42 U.S.C. § 1983 seeking declaratory and injunctive relief, and attorney's fees and costs. She contended that enforcing section 59.1-443.2 against her for publishing copies of public records lawfully obtained from a government website violates the First Amendment. During a hearing on Ostergren's motion for preliminary injunctive relief, Virginia's Attorney General agreed not to enforce the statute against Ostergren while this action remains pending.

On August 22, 2008, the district court concluded, based upon stipulated facts, that "Virginia Code § 59.1-443.2 is unconstitutional as applied to Ostegren's [sic] website as it presently exists." *Ostergren*, 2008 WL 3895593, at *14. On June 2, 2009, after further briefing and argument about injunctive relief, the court entered

> a permanent injunction . . . against enforcement of Va. Code § 59.1-443.2 against any iteration of Ostergren's website, now or in the future, that simply republishes publicly obtainable documents containing unredacted SSNs of Virginia legislators, Virginia Executive Officers or Clerks of Court as part as [sic] an effort to reform Virginia law and practice respecting the publication of SSNs online.

*Ostergren*, 643 F. Supp. 2d at 770. The Attorney General appealed, challenging the district court's August 22, 2008, constitutional determination. Ostergren cross-appealed, arguing that the June 2, 2009, award of injunctive relief was too narrow. We consider the appeal and cross-appeal below.

## II.

First we review the district court's August 22, 2008, constitutional determination. "We review de novo a properly preserved constitutional claim." *United States v. Hall*, 551 F.3d

257, 266 (4th Cir. 2009). Virginia argues that SSNs are categorically unprotected speech that may be prohibited entirely. Alternatively, Virginia argues that the state interest in preserving citizens' privacy by limiting SSNs' public disclosure justifies barring Ostergren's speech. In other words, Virginia maintains that the First Amendment does not apply here and that, even if it does, enforcing section 59.1-443.2 against Ostergren should survive First Amendment scrutiny. We address each argument in turn.[7]

## A.

The First Amendment's protection of "freedom of speech, or of the press," was designed to allow individuals to criticize their government without fear. U.S. Const. amend I; *see Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("There

---

[7]Virginia challenged standing and ripeness before the district court but not on appeal. We observe that standing and ripeness are established merely to satisfy ourselves of our jurisdiction. Although no prosecution occurred, Ostergren has standing because the Attorney General planned to initiate prosecution and section 59.1-443.2 was recently amended to reach her speech. *See N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) ("A non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents . . . a credible threat [of prosecution], and a case or controversy thus exists in the absence of compelling evidence to the contrary." (internal quotations and alterations omitted)); *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (holding that where a law was recently amended to cover conduct at issue "[i]t would be unreasonable to assume" that the government made that change "without intending that it be enforced"). Furthermore, Ostergren's constitutional claim regarding publishing Virginia land records appears ripe because "[t]he factual situation is well-developed," there are "no material facts that are in dispute," and "[t]he parties argue only on the application of the law." *Ostergren*, 2008 WL 3895593, at *5; *see Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) ("balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration" to assess ripeness and noting that "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties" (internal quotations omitted)).

is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) (calling liberty to criticize government conduct "the central meaning of the First Amendment"). This protection also precludes the government from silencing the expression of unpopular ideas. *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). Accordingly, laws restricting the content of expression normally are invalid under the First Amendment unless narrowly tailored to promote a compelling state interest. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest."); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid.").

The Supreme Court has nevertheless identified certain categories of "unprotected" speech that may be circumscribed entirely. Fighting words, obscenity, incitement of illegal activity, and child pornography are examples. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942); *Roth v. United States*, 354 U.S. 476, 485 (1957); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969); *New York v. Ferber*, 458 U.S. 747, 764 (1982); *see also Schenck v. United States*, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."). The Court has said that these categories of unprotected speech "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky*, 315 U.S. at 572.

Virginia argues that the unredacted SSNs on Ostergren's website should not be protected under the First Amendment

because they facilitate identity theft and are no essential part of any exposition of ideas. *See* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1146-47 (2005) (arguing that SSNs and computer passwords are "categories of speech that are likely to have virtually no noncriminal uses" and that "[r]estricting the publication of full social security numbers or passwords . . . will not materially interfere with valuable speech"). Although these observations might be true under certain circumstances, we cannot agree with Virginia's argument here. The unredacted SSNs on Virginia land records that Ostergren has posted online are integral to her message. Indeed, they *are* her message. Displaying them proves Virginia's failure to safeguard private information and powerfully demonstrates why Virginia citizens should be concerned.[8] *Cf. United States v. Hubbell*, 530 U.S.

---

[8]Virginia argues that Ostergren could redact several digits from each SSN and still express her message. But the First Amendment protects Ostergren's freedom to decide how her message should be communicated. Although wearing a jacket bearing the words "Boo for the Draft" rather than "Fuck the Draft" may convey the same political critique, the Supreme Court found that the government cannot prohibit the more offensive version. *Cohen v. California*, 403 U.S. 15, 24 (1971) (noting "the usual rule that governmental bodies may not prescribe the form or content of individual expression"). The Court explained:

> [M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech has little or no regard for that emotive function which practically speaking, may often be the more important element of the overall message sought to be communicated.

*Id.* at 26. Furthermore, partial redaction would diminish the documents' shock value and make Ostergren less credible because people could not tell whether she or Virginia did the partial redaction. *See Ross v. Midwest Commc'ns, Inc.*, 870 F.2d 271, 274 (5th Cir. 1989) (holding that disclosing a rape victim's name in a documentary about the convicted man's potential innocence was "of unique importance to the credibility and per-

27, 36-37 (2000) (noting that "the act of producing documents in response to a subpoena . . . may implicitly communicate statements of fact" because "[b]y producing documents . . . the witness would admit that the papers existed, were in his possession or control, and were authentic" (internal quotations omitted)).

We find particularly significant just how Ostergren communicates SSNs. She does not simply list them beside people's names but rather provides copies of entire documents maintained by government officials. Given her criticism about how public records are managed, we cannot see how drawing attention to the problem by displaying those very documents could be considered unprotected speech. Indeed, the Supreme Court has deemed such speech particularly valuable within our society:

> Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975). Thus, although we do not foreclose the possibility that communicat-

---

suasive force of the story"); *Gilbert v. Med. Econ. Co.*, 665 F.2d 305, 308 (10th Cir. 1981) (regarding an article about medical malpractice that disclosed a doctor's name and photograph, finding that "these truthful representations . . . strengthen the impact and credibility of the article" because "[t]hey obviate any impression that the problems raised in the article are remote or hypothetical, thus providing an aura of immediacy and even urgency that might not exist had plaintiff's name and photograph been suppressed").

ing SSNs might be found unprotected in other situations, we conclude, on these facts, that the First Amendment does reach Ostergren's publication of Virginia land records containing unredacted SSNs.[9]

### B.

We next consider whether enforcing section 59.1-443.2 against Ostergren for posting online Virginia land records containing unredacted SSNs survives First Amendment scrutiny. Although Ostergren's political speech criticizing Virginia "lies at the very center of the First Amendment," *Gentile*, 501 U.S. at 1034, publishing SSNs online undermines individual privacy. Freedom of speech must therefore be weighed against the "right of privacy" which the Supreme Court has also recognized. *See Cox Broad.*, 420 U.S. at 488 (recognizing "the so-called right of privacy"). The Court tried to strike that balance in *Cox Broadcasting* and subsequent cases involving restrictions on truthful publication of private information. Because we must decide where this case fits within that balance, we begin our analysis by reviewing those decisions.

In *Cox Broadcasting*, the Supreme Court ruled that the First Amendment prohibits a lawsuit against a television station for broadcasting a rape victim's name when the station learned

---

[9]After this appeal was briefed and orally argued, the Supreme Court clarified that *Chaplinksy* does not provide a sufficient test for identifying categories of unprotected speech because such categories derive from history and tradition. *See United States v. Stevens*, 130 S.Ct. 1577, 1586 (2010) (declining to recognize a new category of unprotected speech for depictions of animal cruelty). The Court also disavowed "a freewheeling authority to declare new categories of speech outside the scope of the First Amendment," admitting only that "[m]aybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Id.* Because we already find Virginia's argument unpersuasive, we need not also conduct the historical analysis that *Stevens* would require.

her identity from a publicly available court record. The issue arose in the context of six youths being indicted for rape and murder. Although their case garnered substantial press attention, the victim's identity was not disclosed because Georgia law prohibited "publish[ing] or broadcast[ing] the name or identity of a rape victim." *Id.* at 472. During trial, the clerk of court showed a reporter the indictments even though they clearly stated the victim's full name. The reporter later explained, "[N]o attempt was made by the clerk or anyone else to withhold the name and identity of the victim from me or from anyone else and the said indictments apparently were available for public inspection upon request." *Id.* at 472 n.3. When the television station employing the reporter later broadcast the victim's name, her father sued for money damages. The Georgia Supreme Court held that his "complaint stated a cause of action 'for the invasion of the . . . right of privacy, or for the tort of public disclosure,'" and rejected the station's First Amendment defense. *Id.* at 474 (quoting *Cox Broad. Corp. v. Cohn*, 200 S.E.2d 127, 130 (Ga. 1973)).

The Supreme Court reversed. Although recognizing "a strong tide running in favor of the so-called right of privacy," *id.* at 488, the Court reasoned that "the interests in privacy fade when the information involved already appears on the public record," *id.* at 494-95. The Court observed that "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." *Id.* at 495. The Court also discussed the importance of truthful reporting about public records and expressed reluctance to create a doctrine that "would invite timidity and self-censorship and very likely lead to the suppression of many items that . . . should be made available to the public." *Id.* at 496. The Court concluded:

> At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the

> public in official court records. . . . Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.

*Id.* The Court explained that "[i]f there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information." *Id.*

Although *Cox Broadcasting* avoided deciding whether truthful publication may ever be punished, subsequent cases helped to clarify the relevant inquiry. In *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308 (1977), the Supreme Court held that a trial court could not bar newspapers from publishing a juvenile offender's name learned during a court proceeding open to the public. The Court explained, "'Once a public hearing ha[s] been held, what transpired there [can]not be subject to prior restraint.'" *Id.* at 311 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 568 (1976)). In *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978), the Court held that Virginia could not punish a newspaper for publishing correct information that had been leaked about confidential proceedings by the Virginia Judicial Inquiry and Review Commission. The Court reasoned that Virginia's interests in preserving respect for courts and protecting individual judges' reputations did not justify prohibiting speech that "clearly served those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect." *Id.* at 839.

The Supreme Court later articulated a constitutional standard based upon these decisions. In *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), the Court observed that *Cox Broadcasting*, *Oklahoma Publishing*, and *Landmark Communications* "all suggest strongly that if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish pub-

lication of the information, absent a need to further a state interest of the highest order." *Daily Mail*, 443 U.S. at 103. This case involved two newspapers convicted under a West Virginia statute that barred publishing the names of juvenile offenders without court approval. Reporters had learned certain juvenile offenders' names by questioning witnesses, police officers, and the prosecutor. The Supreme Court invalidated the convictions because West Virginia's interest in protecting juvenile offenders' anonymity was insufficiently important and "there [was] no evidence to demonstrate that the imposition of criminal penalties [was] necessary to protect the confidentiality of juvenile proceedings." *Id.* at 105.

After this flurry of decisions, the Supreme Court applied the *Daily Mail* standard roughly a decade later in another case about a rape victim. In *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989), the appellee B.J.F. reported to local police that she had been robbed and sexually assaulted. Despite its internal policy against revealing names of rape victims, the police department inadvertently placed a police report containing B.J.F.'s name in its press room. The department did not restrict access to the press room or to reports made available therein. After a reporter copied the police report verbatim, an area newspaper published an article containing B.J.F.'s full name. She sued for money damages, claiming the newspaper had been per se negligent because Florida law prohibited printing, publishing, or broadcasting names of rape victims in any instrument of mass communication. During trial, B.J.F. testified that publicity of her rape made her suffer extreme embarrassment, receive additional threats of rape, change her phone number and residence, seek police protection, and obtain medical health counseling. The jury awarded damages and a Florida appellate court affirmed, rejecting the newspaper's First Amendment defense.

The Supreme Court reversed. Before applying the *Daily Mail* standard regarding truthful publication of lawfully obtained information, the Court noted three underlying con-

siderations that justified this analytical approach. First, that the standard covers only lawfully obtained information means that the government retains ample means of protecting interests that might be threatened by publication. This consideration has additional implications when the government itself initially holds the information:

> To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

*Id.* at 534. Second, "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535. The Court added that "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." *Id.* Third, "'timidity and self-censorship' . . . may result from allowing the media to be punished for publishing certain truthful information." *Id.* (quoting *Cox Broad.*, 420 U.S. at 496). The Court explained that, where the government discloses private information, not protecting its publication "would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication . . . even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question." *Id.* at 536. Having reiterated these considerations, the Court endorsed the

*Daily Mail* standard: "We hold . . . that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." *Id.* at 541.

Applying this standard, the Supreme Court found that the newspaper article about B.J.F. truthfully published lawfully obtained information about a matter of public significance. The Court also found that punishing the newspaper was not narrowly tailored to Florida's interest in preserving rape victims' privacy because the police department itself could have initially withheld the sensitive information.[10] That the department's disclosure was actually inadvertent was immaterial. *See id.* at 538 ("B.J.F.'s identity would never have come to light were it not for the erroneous, if inadvertent, inclusion by the Department of her full name in an incident report made available in a pressroom open to the public."). The Court concluded: "Where, as here, the government has failed to police itself in disseminating information, it is clear under *Cox Broadcasting*, *Oklahoma Publishing*, and *Landmark Communications* that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity." *Id.*

Notably, *Cox Broadcasting* and its progeny avoided decid-

---

[10]Notably, the Court expressly avoided deciding whether Florida's asserted interest constituted "a state interest of the highest order"—resolving the case instead solely on narrow-tailoring grounds. *Daily Mail*, 443 U.S. at 103; *see Florida Star*, 491 U.S. at 537 ("At a time in which we are daily reminded of the tragic reality of rape, it is undeniable that these are highly significant interests, a fact underscored by the Florida Legislature's explicit attempt to protect these interests by enacting a criminal statute prohibiting much dissemination of victim identities. We accordingly do not rule out the possibility that, in a proper case, imposing civil sanctions for publication of the name of a rape victim might be so overwhelmingly necessary to advance these interests as to satisfy the *Daily Mail* standard.").

ing the ultimate question of whether truthful publication could ever be prohibited. Each decision resolved this ongoing conflict between privacy and the First Amendment "only as it arose in a discrete factual context." *Florida Star*, 491 U.S. at 530. The *Florida Star* Court noted that "the future may bring scenarios which prudence counsels our not resolving anticipatorily." *Id.* at 532 (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931) (hypothesizing "publication of the sailing dates of transports or the number and location of troops")).

Those decisions nonetheless make clear that Ostergren's constitutional challenge must be evaluated using the *Daily Mail* standard.[11] Accordingly, Virginia may enforce section 59.1-443.2 against Ostergren for publishing lawfully obtained, truthful information about a matter of public significance "only when narrowly tailored to a state interest of the highest order." *Id.* at 541. Virginia concedes that Ostergren lawfully obtained and truthfully published the Virginia land records that she posted online. Moreover, this information plainly concerns "a matter of public significance," *Daily Mail*, 443 U.S. at 103, because displaying the contents of public records and criticizing Virginia's release of private information convey political messages that concern the public, *see Cox Broad.*, 420 U.S. at 495 ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media."); *Landmark Commc'ns*, 435 U.S. at 839 (deeming the operation of government affairs "a matter of public interest"). There-

---

[11]Counsel for the Attorney General conceded during oral argument that, under this standard, Ostergren's advocacy website cannot be distinguished from a television station or newspaper. *See Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1145 (W.D. Wash. 2003) (considering a website about police accountability "analytically indistinguishable from a newspaper" where the website "communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance").

fore, the only remaining issues are (1) whether Virginia has asserted a state interest of the highest order and (2) whether enforcing section 59.1-443.2 against Ostergren would be narrowly tailored to that interest. We address each in turn.

1.

Virginia asserts that its interest in protecting individual privacy by limiting SSNs' public disclosure constitutes "a state interest of the highest order." *Daily Mail*, 443 U.S. at 103. Although noting that "it should not be difficult for a court to conclude that the protection of SSNs from public disclosure should qualify as a State interest of the highest order," the district court reached the opposite conclusion upon reasoning that Virginia's conduct had been inconsistent with that interest. *Ostergren*, 2008 WL 3895593, at *10; *see id.* ("[T]he State's own conduct in making those SSNs publicly available through unredacted release on the Internet significantly undercuts the assertion . . . that the State actually regards protection of SSNs as an interest of the highest order."). Before discussing this issue, we address the proper analytical framework for determining what constitutes a state interest of the highest order.

a.

In assessing Virginia's asserted interest, the district court put to one side that interest's actual importance and instead considered only whether Virginia itself considered the interest important—applying a subjective rather than objective standard. The court explained, "[I]t is not the perception of a federal court that defines a State interest of the highest order. Instead, it is the State's view and its conduct that, under accepted First Amendment jurisprudence, must supply the basis for such a conclusion." *Id.*; *see Ostergren*, 643 F. Supp. 2d at 766 ("Whether the State has an interest of the highest order is answered by examining objectively the means by which the State treats the information in question."). The

court later added, "When, as here, a State legislature has expressed its own view of the priority of a State interest, a federal court is not permitted to revise that view to save the statute." *Ostergren*, 2008 WL 3895593, at *11.

In reaching this conclusion, the district court may have limited its consideration unnecessarily. In deciding what constitutes a state interest of the highest order, courts cannot be bound by "the State's view and its conduct." *Id.* at *10. For example, although a state government might demonstrate a fervent, consistently applied policy of punishing people for not cleaning up after their dogs, we would not therefore be compelled to consider this a state interest of the highest order. Conversely, although a state government might practice racial discrimination for decades—and many have—we would not therefore be barred from considering racial equality a state interest of the highest order. *See Regents of Univ. of Ca. v. Bakke*, 438 U.S. 265, 396 (1978) (Marshall, J., concurring) ("In light of the sorry history of discrimination and its devastating impact on the lives of Negroes, bringing the Negro into the mainstream of American life should be a state interest of the highest order.").

Furthermore, Supreme Court precedent applying the *Daily Mail* standard makes clear that objective criteria can be considered when deciding what constitutes a state interest of the highest order. In *Butterworth v. Smith*, 494 U.S. 624 (1990), Florida maintained that its interest in preserving grand jury secrecy justified preventing a reporter from publicizing his own grand jury testimony. Concluding that Florida's asserted interest did not constitute a state interest of the highest order, the Court observed that the Federal Rules of Criminal Procedure contained no such requirement and that "only 14 States have joined Florida in imposing an obligation of secrecy on grand jury witnesses." *Id.* at 635. The Court explained that, "[w]hile these practices are not conclusive as to the constitutionality of Florida's rule, they are *probative of the weight to be assigned Florida's asserted interests* and the extent to

which the prohibition in question is necessary to further them." *Id.* (emphasis added).**¹²**

Despite concluding that a subjective standard was required, the district court nevertheless observed that "in concept, Va. Code § 59.1-443.2 furthers what ought to be, by any objective measure, a State interest of the highest order." *Ostergren*, 643 F. Supp. 2d at 769. We turn now to that issue.

b.

We find it helpful to place our inquiry in historical context by discussing the genesis of modern privacy concerns surrounding SSNs. The Social Security Administration created SSNs in 1936 merely to track individuals' earnings and eligibility for Social Security benefits. They soon became used for other purposes, however, because SSNs provide unique permanent identification for almost every person. Indeed, the federal government was among the first to avail itself of their utility. In 1943, President Roosevelt ordered that any federal agency which "establish[es] a new system of permanent account numbers pertaining to individual persons" must "utilize exclusively the Social Security Act account numbers." Exec. Order No. 9397, 8 Fed. Reg. 16,095 (Nov. 30, 1943). Countless state and federal agencies later adopted the SSN, particularly during the 1960s. For example, Congress authorized the Internal Revenue Service to begin using the SSN for taxpayer identification in 1961. *See* Act of Oct. 5, 1961, Pub. L. No. 87-397, 75 Stat. 828 (1961). Private organizations, especially financial institutions, also started using the SSN for account identification and other purposes. Indeed, the Bank

---

**¹²**We note that, contrary to the concurrence's suggestion, our First Amendment analysis does indeed involve "a fact-intensive inquiry into the state's view and its actual conduct in furthering its asserted interest." *Infra* at 47. We simply conduct that inquiry mainly regarding narrow-tailoring —the approach *Florida Star* employed—rather than regarding the state interest itself—the concurrence's preferred approach.

Records and Foreign Transactions Act, Pub. L. No. 91-508, 84 Stat. 1114 (1970), required banks, savings and loan associations, credit unions, and securities brokers and dealers to collect customers' SSNs. *See, e.g.*, *id.* § 101 (requiring "the maintenance of appropriate types of records by insured banks of the United States where such records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings").

Public concern about information privacy, however, soon increased. In 1973, the Department of Health, Education, and Welfare published an influential report warning about "an increasing tendency for the Social Security number to be used as if it were an SUI [standard universal identifier]." U.S. Department of Health, Education, and Welfare, Report of the Secretary's Advisory Committee on Automated Personal Data Systems: Records, Computers, and the Rights of Citizens xxxii (1973). Congress responded by enacting the Privacy Act of 1974, 5 U.S.C. § 552a, which prohibits government agencies from denying rights, privileges, or benefits because a person withholds his SSN. By enacting this statute, "Congress sought to curtail the expanding use of social security numbers by federal and local agencies and, by so doing, to eliminate the threat to individual privacy and confidentiality of information posed by common numerical identifiers." *Doyle v. Wilson*, 529 F. Supp. 1343, 1348 (D. Del. 1982). The related Senate Report stated that widespread usage of SSNs was "one of the most serious manifestations of privacy concerns in the Nation." S. Rep. No. 93-1183 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6916, 6943.

Since then, usage of SSNs by federal and local agencies, financial institutions, and other organizations has become nearly ubiquitous. Beyond simply matching records with accounts, these organizations also frequently use SSNs for account authentication. This means that the SSN provides a password that lets one modify account information. By consequence, the SSN has become a crucial piece of information

allowing the creation or modification of myriad personal accounts. *See* U.S. Government Accountability Office, GAO No. 09-759T, Identity Theft: Governments Have Acted to Protect Personally Identifiable Information, but Vulnerabilities Remain 8 (calling the SSN "a vital piece of information needed to function in American society" and noting that "U.S. citizens generally need an SSN to pay taxes, obtain a driver's license, or open a bank account, among other things"). Unfortunately, for that reason, SSNs can easily be used to commit identity theft—that is, tendering another's identifying information to carry out financial fraud or other criminal activity. *See* Jonathan J. Darrow & Stephen D. Lichtenstein, *"Do You Really Need My Social Security Number?" Data Collection Practices in the Digital Age*, 10 N.C. J. L. & Tech. 1, 4-5 (2008) ("Reflecting the unfortunate reality that a single number can provide access to multiple accounts, commentators have lamented that the social security number has become a 'skeleton key' for identity theft criminals."). One therefore has a considerable privacy interest in keeping his SSN confidential.

We previously considered this privacy interest in *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993). Invalidating a statute that required people to provide their SSN before they could vote and then publicly disclosed that confidential information, we observed:

> Since the passage of the Privacy Act, an individual's concern over his SSN's confidentiality and misuse has become significantly more compelling. For example, armed with one's SSN, an unscrupulous individual could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck.

*Id.* at 1353; *see also City of Kirkland v. Sheehan*, No. 01-2-09513-7, 2001 WL 1751590, at *6 (Wash. Sup. Ct. May 10,

2001) ("[A]ccess to an SSN allows a person, agency or company to more efficiently and effectively search for and seize information and assets of another, a power originally available only to the government and one which was subject to direct Constitutional restraint."). We added that "the harm that can be inflicted from the disclosure of a SSN to an unscrupulous individual is alarming and potentially financially ruinous." *Greidinger*, 988 F.2d at 1354. On average, victims of identity theft lose about $17,000 and must spend over $1,000 and 600 hours of personal time cleaning up their credit reports. *See* Danielle Keats Citron, *Reservoirs of Danger: The Evolution of Public and Private Law at the Dawn of the Information Age*, 80 S. Cal. L. Rev. 241, 253 (2007).

Reflecting these concerns, Congress and all 50 States have passed laws regulating SSN collection and disclosure. *See* Andrew Serwin, Information Security and Privacy §§ 22-23 (2009); *see, e.g.*, 18 U.S.C. § 2721 (restricting release of SSNs from motor vehicle records). Some States also recognize a constitutional right barring the government from disclosing SSNs without consent. *See, e.g.*, *State ex rel. Beacon Journal Publ'g Co. v. City of Akron*, 640 N.E.2d 164, 169 (Ohio 1994). Although not dispositive, these practices indicate a broad consensus that SSNs' public disclosure should be strictly curtailed.

Given the serious privacy concerns and potential harm stemming from SSN dissemination, Virginia's asserted interest in protecting individual privacy by limiting SSNs' public disclosure may certainly constitute "a state interest of the highest order." *Daily Mail*, 443 U.S. at 103. We need not ultimately decide that question, however, because our holding below regarding narrow-tailoring suffices to resolve the constitutional challenge. We discussed this issue merely to provide guidance to the district court fashioning injunctive relief on remand. *See Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 299 n.20 (4th Cir. 2007) ("We choose to address this discovery issue because it is likely to arise on remand.");

*Charbonnages de France v. Smith*, 597 F.2d 406, 417 (4th Cir. 1979) ("[I]t may be appropriate to address a few points presented on this appeal that, although not dispositive here, could arise as important issues on remand.").

2.

We next consider whether enforcing section 59.1-443.2 against Ostergren would be narrowly tailored to Virginia's asserted interest in preserving individual privacy by protecting SSNs from public disclosure. Supreme Court precedent imposes a stringent standard regarding narrow-tailoring. *Cox Broadcasting* and its progeny indicate that punishing truthful publication of private information will almost never be narrowly tailored to safeguard privacy when the government itself released that information to the press. *See Cox Broad.*, 420 U.S. at 496 ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it."); *Florida Star*, 491 U.S. at 534 ("Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts."). Even where disclosure to the press was accidental, *Florida Star* indicates that the press cannot be prevented from publishing the private information. In that case, B.J.F.'s identity was disclosed to the press accidentally despite the police department's policy against revealing rape victims' names. The Supreme Court nonetheless concluded that "[w]here . . . the government has failed to police itself in disseminating information, it is clear under *Cox Broadcasting*, *Oklahoma Publishing*, and *Landmark Communications* that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity." *Florida Star*, 491 U.S. at 538.

In both *Cox Broadcasting* and *Florida Star*, the government disclosed private information to the press and thereafter sought to prevent media outlets from truthfully publishing that

information. This case appears similar in that Virginia like-wise disclosed public records containing private information to Ostergren and now seeks to prevent her from publishing them online. Because Virginia "failed to police itself in disseminating information," *Cox Broadcasting* and *Florida Star* suggest that preventing Ostergren from publishing those records could almost never be narrowly tailored. *Id.* According to their stringent standard, Ostergren could never be prohibited from publicizing SSN-containing Virginia land records she already lawfully obtained (including those posted on her website),[13] and Virginia would need to redact all original land records available from courthouses (not merely digital copies available through secure remote access) before Ostergren could be prohibited from publishing SSN-containing Virginia land records she might later obtain.[14]

---

[13]Whereas Ostergren posted online only about 30 records from various States, her testimony indicates she obtained thousands of other public records containing unredacted SSNs.

[14]The district court was justifiably concerned about reaching this extreme conclusion. When Ostergren maintained that under *Cox Broadcasting* she could continue publicizing additional SSNs until Virginia finished redacting all original land records and digital copies, the court responded,

> [I]f I understand it correctly, under the relief you want, she can go to the record, she can take thousands or hundreds of thousands, whatever is there, and publish them, and if she thinks that 20 names have shock value, what do you think her attitude might be toward publishing thousands or hundreds of thousands?

J.A. 192. Ostergren replied,

> It is relief I want, and I wish I could tell you a principled way to make it narrower, but I can't think of one, and I think that the *Cox* court struck the balance between privacy and free speech in the context of public records, and the way that they struck the balance was to hold that when the Government makes something available, they are responsible for controlling the dissemination of information. They can't make someone else do it.

J.A. 193. The court responded again,

Despite apparent similarities, however, the instant case also differs from *Cox Broadcasting* and *Florida Star* in two critical respects that warrant consideration because they impact our narrow-tailoring analysis. First, this case implicates a different conception of privacy—one predicated upon control of personal information rather than secrecy. Second, Virginia's knowledge about and practical control over the private information here differs significantly from the situations involved in *Cox Broadcasting* and *Florida Star*. Given these differences, this case requires a more nuanced analysis than that suggested above.[15] We consider each difference separately below and then discuss the proper narrow-tailoring analysis.

a.

*Cox Broadcasting* involved Georgia's tort of public disclosure of private information, in which "the plaintiff claims the right to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities." *Cox Broad.*, 420 U.S. at 489.

---

> [W]hat if accidentally the Social Security Administration, somebody went in and released all the Social Security numbers in the country? Are you saying that Congress couldn't come in with a statute and say, you can't replicate these things? What they would do is try to take the system that had gone wrong, fix what they can fix, knowing that there are people who have already gotten into the database that spilled accidentally, but knowing the damage is somewhat limited and saying we are going to stop it right here, and the way we're going to stop it is making it unlawful for you, anybody, to take this information that's been accidentally spilled and use it.

J.A. 193. We share the district court's concern and consider below how the instant case may be distinguished from *Cox Broadcasting* and *Florida Star* regarding narrow-tailoring.

[15]We are distinguishing *Cox Broadcasting* and *Florida Star* merely with regard to the proper narrow-tailoring analysis, not with regard to whether the *Daily Mail* standard applies.

This cause of action "define[s] and protect[s] an area of privacy free from unwanted publicity in the press." *Id.* at 491. "[T]he gravamen of the claimed injury is the publication of information, whether true or not, the dissemination of which is embarrassing or otherwise painful to an individual." *Id.* at 489. *Florida Star* involved the same privacy interest. B.J.F. suffered emotional distress because the fact that she had been raped, information she had hoped to keep secret, had been widely publicized. *See Florida Star*, 491 U.S. at 528 ("B.J.F. testified that she had suffered emotional distress from the publication of her name.").

*Cox Broadcasting* and *Florida Star* thus involved a particular conception of privacy whereby "private" matters are those one would prefer to keep hidden from other people because disclosure would be embarrassing or compromising.[16] *See Whalen v. Roe*, 429 U.S. 589, 598-99 (1977) (noting cases protecting "privacy" that involved "the individual interest in avoiding disclosure of personal matters"). Under this conception, one's privacy interest hinges upon whether information has been kept secret, and protecting privacy involves ensuring that people can keep personal matters secret or hidden from public scrutiny. *See* Daniel J. Solove, *Conceptualizing*

---

[16]The Seventh Circuit has explored the human desire for secrecy about certain personal matters:

> Even people who have nothing rationally to be ashamed of can be mortified by the publication of intimate details of their life. Most people in no wise deformed or disfigured would nevertheless be deeply upset if nude photographs of themselves were published in a newspaper or a book. They feel the same way about photographs of their sexual activities, however "normal," or about a narrative of those activities, or about having their medical records publicized. Although it is well known that every human being defecates, no adult human being in our society wants a newspaper to show a picture of him defecating. The desire for privacy illustrated by these examples is a mysterious but deep fact about human personality.

*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir. 1993).

*Privacy*, 90 Cal. L. Rev. 1087, 1105 (2002) ("One of the most common understandings of privacy is that it constitutes the secrecy of certain matters. Under this view, privacy is violated by the public disclosure of previously concealed information."). Because this conception of privacy presupposes secrecy, personal matters that have been publicly disclosed can no longer be considered private. *See id.* at 1107 ("[T]he view of privacy as secrecy often leads to the conclusion that once a fact is divulged in public, no matter how limited or narrow the disclosure, it can no longer remain private."). For example, the Supreme Court embraced this reasoning in Fourth Amendment cases indicating that one's "reasonable expectation of privacy" cannot encompass anything exposed to the public or third parties. *See California v. Greenwood*, 486 U.S. 35, 40 (1988) (finding no reasonable expectation of privacy in garbage because "plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public"); *United States v. Miller*, 425 U.S. 435, 442 (1976) (finding no reasonable expectation of privacy in personal financial documents held by banks because "the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business").

The instant case involves a different conception of privacy not predicated upon secrecy. *Cox Broadcasting* and *Florida Star* addressed the privacy concern that disclosing certain personal matters (information one had hoped to keep secret) might cause embarrassment or reputational damage. But people do not feel embarrassed when asked to provide their SSN; nor do they fear that their reputation will suffer when others find out that number. People worry only about how their SSN will be used—more specifically, about whether some unscrupulous person will steal their identity. The Fifth Circuit made this same observation:

> [A]n individual's informational privacy interest in his or her SSN is substantial. The privacy concern at

issue is not, of course, that an individual will be
embarrassed or compromised by the particular SSN
that she has been assigned. Rather, the concern is
that the simultaneous disclosure of an individual's
name and confidential SSN exposes that individual
to a heightened risk of identity theft and other forms
of fraud.

*Sherman v. U.S. Dep't of the Army*, 244 F.3d 357, 365 (5th
Cir. 2001); *see also Nat'l Cable & Telecomms. Ass'n v. FCC*,
555 F.3d 996, 1001 (D.C. Cir. 2009) ("[W]e do not agree that
the interest in protecting customer privacy is confined to pre-
venting embarrassment . . . ."). Accordingly, this case
involves a particular conception of privacy whereby one does
not mind publicity itself but nonetheless would prefer to con-
trol how personal information will be used or handled. Under
this conception, privacy does not hinge upon secrecy but
instead involves "the individual's *control* of information con-
cerning his or her person." *Nat'l Cable & Telecomms. Ass'n*,
555 F.3d at 1001 (emphasis added and internal quotations
omitted).

This difference affects our narrow-tailoring analysis
because *Cox Broadcasting*'s holding stemmed from the con-
ception of privacy predicated upon secrecy. The Supreme
Court noted that Georgia's tort of public disclosure of private
information provided no remedy where the disclosed informa-
tion was already publicly available. *See* Restatement (Second)
of Torts § 652D cmt. b ("There is no liability when the defen-
dant merely gives further publicity to information about the
plaintiff that is already public."). The Court thus concluded
that "the interests in privacy fade when the information
involved already appears on the public record." *Cox Broad.*,
420 U.S. at 494-95. This makes sense where privacy hinges
upon secrecy because publicly accessible information could
not be considered private anymore and any emotional distress
resulting from disclosure would likely have already occurred.[17]

---

[17]The emotional distress that a rape victim experiences because of pub-
lic disclosure of her identity occurs the moment she discovers that others

But the reasoning makes noticeably less sense where privacy hinges upon control. Whereas emotional distress resulting from disclosure occurs only once when one discovers the publicity, publicly accessible SSNs could be misused repeatedly over time until they become less easily accessed. Furthermore, because SSNs are more easily accessed online than in bound original land records, people worried about preventing identity theft (rather than embarrassment) would indeed have a considerable privacy interest against "merely giv[ing] further publicity." Restatement (Second) of Torts § 652D cmt. b.

The Supreme Court employed similar reasoning in *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989). In that case, reporters filed requests under the Freedom of Information Act, 5 U.S.C. § 552, for criminal identification records, known as "rap sheets," that the Federal Bureau of Investigation had created by collecting biographical data and criminal history found in different state and local public records. The government refused to disclose these rap sheets based on the statutory exception for "records or information compiled for law enforcement purposes . . . the production of [which] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Arguing that this exception was inapplicable, the reporters reasoned that "[b]ecause events summarized in a rap sheet have been previously disclosed to the public . . . [the] privacy interest in avoiding disclosure of a federal compilation of these events approaches zero." *Reporters Comm.*, 489 U.S. at 762-63. The Supreme Court expressly rejected this "cramped notion of personal privacy" and expounded as follows:

> [T]he common law and the literal understandings of privacy encompass the individual's control of infor-

---

know her secret. The harm feared by someone whose SSN has been disclosed, however, does not occur upon disclosure but rather upon the misuse of that information.

mation concerning his or her person. In an organized society, there are few facts that are not at one time or another divulged to another. Thus the extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private.

*Id.* at 763. The Court then observed that "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *Id.* at 764. In another case, the Court reiterated what this analysis makes clear: "An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994).

b.

The instant case also differs in another respect from *Cox Broadcasting* and *Florida Star* regarding narrow-tailoring. There, the Supreme Court held that punishing truthful publication of private information was not narrowly tailored because the government could have initially refused to disclose that information to the press. This rationale assumes that the government could have easily prevented initial disclosure. *See Florida Star*, 491 U.S. at 538 ("[W]here the government itself provides information to the media, it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech."). That assumption does not fully apply in this case.

Both *Cox Broadcasting* and *Florida Star* involved situations in which a government employee created the document

containing sensitive information that was later disclosed. Thus, initial disclosure could have been avoided by not recording the information or sealing the document from the outset. In *Florida Star*, the Court recognized that the police officer who prepared the incident report could have simply omitted B.J.F.'s name. *See id.* Likewise, in *Cox Broadcasting*, the government could have omitted the victim's name from its indictments or placed them under seal. *See Cox Broad.*, 420 U.S. at 496 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information.").

This appeal presents a quite different situation. For the most part, private attorneys (rather than the government) were responsible for creating real estate documents containing people's SSNs and then submitting those documents for recording in Virginia. The clerk of court could have inspected these documents before recording them and redacted any SSNs, but even this solution differs from *Cox Broadcasting* and *Florida Star*, where the government did not have to search for the sensitive information needing redaction. Given that every year hundreds of thousands of documents are submitted for recording in Virginia, inspecting each one would have been no small undertaking. Most importantly, however, attorneys began filing documents containing SSNs long before Virginia could have been expected to comprehend the current threat of identity theft. For this reason, we find inapplicable *Cox Broadcasting*'s observation that "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." 420 U.S. at 495.

Virginia currently prohibits attorneys from submitting real estate documents for recording that contain unredacted SSNs. *See* Va. Code § 17.1-227. Given the historical circumstances, however, clerks of court still possess millions of land records, over three percent of which probably contain unredacted

SSNs. Inspecting all these records to find and redact SSNs would be far more burdensome than sealing indictments and police reports revealing rape victims' identities. Moreover, clerks cannot place original land records under seal while completing such redaction because people must inspect them to verify who owns what during real estate transactions. *See* Va. Code § 17.1-208 (requiring that "any records and papers of every circuit court that are maintained by the clerk of the circuit court shall be open to inspection by any person"). Furthermore, regarding land records available through secure remote access, the parties agree that running software used for redacting SSNs costs about four cents per page and has a one to five percent error rate. Virginia thus faces considerable obstacles in avoiding initial disclosure of sensitive information that *Cox Broadcasting* and *Florida Star* did not have to consider. Such realities plainly must factor into our narrow-tailoring analysis.

c.

The factual differences between this case and *Cox Broadcasting* and *Florida Star* suggest the need for a more nuanced analytical approach to the *Daily Mail* standard's narrow-tailoring requirement. The Supreme Court's recognition of different conceptions of privacy—one focused upon secrecy and incompatible with any disclosure, the other focused upon control and consistent with limited disclosure—and the unrealistic challenge of preserving total secrecy in this situation strongly suggest that Virginia should have more latitude to limit disclosure of land records containing unredacted SSNs than *Cox Broadcasting* and *Florida Star* allowed for protecting rape victims' anonymity. Specifically, the Court's First Amendment jurisprudence does not necessarily require that Virginia redact SSNs from all original land records maintained in courthouse archives before someone like Ostergren may be prevented from publishing them online.[18] Ostergren's

---

[18]Ostergren took the contrary position below, arguing that all original land records had to be redacted before Virginia could prevent Ostergren

website supports this conclusion by recognizing the critical difference between original land records available from court-houses and digital land records available through secure remote access:

> Once records are recorded at the courthouse, they become public (unless sealed by a judge) and anyone can get them. But shouldn't we all have to drive to the Courthouse to see them? Yes, but sadly that is not the case anymore. Legislators have kowtowed to special interests and in VA, they voted specifically to allow these records online.

The Virginia Watchdog, http://www.opcva.com/watchdog/RECORDS.html (last visited Apr. 26, 2010) (emphasis omitted); *see Reporters Comm.*, 489 U.S. at 764 (noting "a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information").

This certainly does not mean, however, that enforcing section 59.1-443.2 against Ostergren would be constitutional. We cannot conclude that prohibiting Ostergren from posting public records online would be narrowly tailored to protecting individual privacy when Virginia currently makes those same records available through secure remote access without having redacted SSNs. The record reflects that 15 clerks of court have not finished redacting SSNs from their land records,

---

from publishing SSNs online. *See* J.A. 120 ("Well, I think that the constitutional argument would still be solid even if the records were not available online, because they are open to anyone who wishes to see them."). But suspending access to courthouse archives until Virginia completed such an enormous redaction effort—requiring manual inspection of over 200 million physical documents—seems impossible because people require access to land records for any real estate transaction.

which are nonetheless available online. Under *Cox Broadcasting* and its progeny, the First Amendment does not allow Virginia to punish Ostergren for posting its land records online without redacting SSNs when numerous clerks are doing precisely that.[19] *Cf. Florida Star*, 491 U.S. at 535 ("[W]here the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release."). Virginia could curtail SSNs' public disclosure much more narrowly by directing clerks not to make land records available through secure remote access until after SSNs have been redacted.[20]

In summary, Virginia's failure to redact SSNs before placing land records online means that barring Ostergren's protected speech would not be narrowly tailored to Virginia's interest in protecting individual privacy. For this reason, we hold that enforcing section 59.1-443.2 against Ostergren for the Virginia land records posted on her website would violate the First Amendment. We thus affirm the district court's August 22, 2008, decision.

---

[19]For the same reason, Virginia could not punish Ostergren for publishing a SSN-containing land record that had accidentally been overlooked during its imperfect redaction process—having a one to five percent error rate—unless Virginia had first corrected that error. Even then, we leave open whether under such circumstances the Due Process Clause would not preclude Virginia from enforcing section 59.1-443.2 without first giving Ostergren adequate notice that the error had been corrected.

[20]Although suspending secure remote access until the redaction process has ended would certainly make enforcing section 59.1-443.2 against Ostergren more narrowly tailored, we leave open whether this safeguard alone would be adequate under the *Daily Mail* standard. Once a greater factual record has been developed on remand, the district court in fashioning injunctive relief should consider whether other safeguards are also constitutionally required. *See, e.g.*, *Florida Star*, 491 U.S. at 534 ("The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination.").

### III.

We next consider Ostergren's challenge to the district court's award of injunctive relief. "We review an order granting an injunction for an abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo." *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 543 (4th Cir. 2009). The court entered

> a permanent injunction . . . against enforcement of Va. Code § 59.1-443.2 against any iteration of Ostergren's website, now or in the future, that simply republishes publicly obtainable documents containing unredacted SSNs of *Virginia legislators, Virginia Executive Officers or Clerks of Court* as part as [sic] an effort to reform Virginia law and practice respecting the publication of SSNs online.

*Ostergren*, 643 F. Supp. 2d at 770 (emphasis added). Ostergren claims this relief was too limited. Because her website includes documents obtained from various States' websites revealing SSNs of non-Virginia public officials, Ostergren contends that the injunction should have reached not only "Virginia legislators, Virginia Executive Officers or Clerks of Court" but also other public officials anywhere in the United States. *Id.*

### A.

When Ostergren raised this issue below during a hearing about the propriety and scope of injunctive relief, counsel for the Attorney General stated that section 59.1-443.2 did not reach non-Virginia public records and that, regardless, the Attorney General would not prosecute Ostergren for publishing such documents. Because the issue had never been disputed, even prior to litigation, the district court declined to decide the question because that would "become[] an advisory opinion." J.A. 301-02. In essence, the court concluded that

Ostergren failed to provide a case or controversy sufficient to trigger federal judicial power. *See Richmond Med. Ctr. For Women v. Herring*, 570 F.3d 165, 172 (2009) ("Article III . . . extends the jurisdiction of courts only to cases and controversies, thus precluding courts from issuing advisory opinions . . . .").

The precise issue the district court passed over was whether the First Amendment prohibits Virginia from enforcing section 59.1-443.2 against Ostergren for publishing on her website public records that contain unredacted SSNs but were obtained from other States' websites. Before entertaining Ostergren's argument about this, we consider our own jurisdiction to decide that question. *See Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002) ("[T]he question of whether we are presented with a live case or controversy is a question we may raise *sua sponte*.").

Article III gives federal courts jurisdiction only over "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. Our judicial power may be exercised only where "'conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). From this requirement courts developed the doctrine of ripeness. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). We assess ripeness by "balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller*, 462 F.3d at 319 (internal quotations omitted). Because "[t]he doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form," *id.* at 318-19 (internal quotations omitted), "problems such as the inadequacy of the record . . . or

ambiguity in the record . . . will make a case unfit for adjudication on the merits," *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (internal quotations omitted).

Ostergren developed almost no evidentiary record to inform our decision about the issue raised. The record does not indicate from which States' websites she obtained public records containing unredacted SSNs, whether those records had previously been publicly disclosed, or how these States protected SSNs from public disclosure. We have only a stipulation that her website "includes public records obtained from government websites in other states." J.A. 86. We cannot imagine how any court could decide the question now presented with such a paltry evidentiary record, particularly given the fact-intensive inquiry required by *Cox Broadcasting* and its progeny. Ostergren also failed to develop any legal theory explaining why our First Amendment analysis about Virginia's land records should also encompass public records from other States. Her attorney admitted at oral argument, "I have not found a satisfactory answer to that question." Finally, thus far the Attorney General does not believe that section 59.1-443.2 would reach non-Virginia public records, and seems opposed to prosecuting Ostergren for publishing such documents. In short, we have no evidence, no argument, and no underlying dispute for the thorny constitutional question that Ostergren has raised. We therefore also have no jurisdiction to decide that question. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 64 (1974) ("Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case." (internal quotations omitted)).

## B.

Although we decline to consider whether the First Amendment prohibits Virginia from enforcing section 59.1-443.2

against Ostergren for publishing non-Virginia public records containing unredacted SSNs, that does not moot Ostergren's cross-appeal. We therefore proceed to consider whether the district court abused its discretion by entering a permanent injunction that protected only "republish[ing] publicly obtainable documents containing unredacted SSNs of Virginia legislators, Virginia Executive Officers or Clerks of Court as part as [sic] an effort to reform Virginia law and practice respecting the publication of SSNs online." *Ostergren*, 643 F. Supp. 2d at 770.

While district courts have broad discretion when fashioning injunctive relief, their powers are not boundless. "Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) (internal quotations omitted); *see Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." (internal quotations omitted)). Because we found that enforcing section 59.1-443.2 against Ostergren for the Virginia land records posted on her website violated the First Amendment under *Cox Broadcasting* and its progeny, we must consider whether the district court's injunctive relief was tailored to fit that violation. We are mindful that "[w]hile a remedy must be narrowly tailored, that requirement does not operate to remove all discretion from the District Court in its construction of a remedial decree." *United States v. Paradise*, 480 U.S. 149, 185 (1987).

The district court tried "to frame a remedial injunction that . . . accommodate[s] the First Amendment rights of Ostergren and, at the same time, affords some protection to the innocent members of the public who have no control of the release of the public records containing their SSNs." *Ostergren*, 643 F. Supp. 2d at 769. Although we commend the court's conscientious effort to find minimally disruptive equitable relief, we conclude that its injunction was not tailored "to fit the nature

and extent of [Virginia's] constitutional violation." *Brinkman*, 433 U.S. at 420 (internal quotations omitted). The following examples are illustrative.

First, the injunction does not protect Ostergren in publishing Virginia land records containing private individuals' SSNs. Under our First Amendment analysis, Ostergren's constitutional right to publish Virginia land records containing unredacted SSNs does not depend on the political status of people whose SSNs are compromised. Therefore, restricting injunctive relief to "the SSN-containing records of State legislators, State Executive Officers and Clerks of Court, those who actually can act to correct the problem," contradicts our First Amendment holding. *Id.* at 770. The district court said that this limitation "largely only ratifies Ostergren's current course of conduct and, as she herself stated, would not have a seriously deleterious effect on her public advocacy." *Id.* But these circumstances do not justify ignoring the First Amendment. Furthermore, the record shows that Ostergren's advocacy did involve private individuals' SSNs. In June 2008, the clerk of court for Pulaski County, Arkansas, refused to remove land records from the Internet pending SSN redaction until Ostergren published land records showing several prominent local citizens' SSNs.

Second, the injunction does not protect Ostergren in publishing Virginia land records that contain non-Virginia public officials' SSNs.[21] Many non-Virginia public officials conduct real estate transactions in Virginia and may have private information exposed in Virginia land records. For example, the record reflects that Ostergren published a land record from

---

[21]Conversely, the injunction protects Ostergren in publishing non-Virginia public records containing Virginia public officials' SSNs. As we have noted, however, the question of whether Virginia could enforce section 59.1-443.2 against Ostergren for publishing non-Virginia public records containing unredacted SSNs was not ripe for judicial consideration. *See ante* at III.A.

Fairfax County, Virginia, that contains General Colin Powell's unredacted SSN. Nothing in our First Amendment analysis justifies treating these records differently from other Virginia land records. Thus, even allowing the distinction between public and private individuals, the injunctive relief still does not adequately remedy Virginia's constitutional violation.

For the reasons stated above, we conclude that the district court abused its discretion by not "tailor[ing] the scope of the remedy to fit the nature and extent of the constitutional violation." *Brinkman*, 433 U.S. at 420 (internal quotations omitted); *see United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it . . . fails to consider judicially recognized factors constraining its exercise of discretion . . . ."). We thus reverse the district court's June 2, 2009, decision and remand for further proceedings consistent with this opinion.

## IV.

We recognize that on remand the district court will require a more developed factual record to determine proper injunctive relief. This includes evidence about the status and effectiveness of Virginia's current redaction efforts. Depending on the scope of section 59.1-443.2, this may also include evidence about non-Virginia public records that Ostergren would publish on her website. Because our constitutional analysis turned on how Virginia has handled public records rather than on whose SSNs are being exposed, the district court should frame the injunctive relief accordingly. The court should also heed *Florida Star*'s warning "that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." 491 U.S. at 533.

*AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED*

DAVIS, Circuit Judge, concurring:

I am pleased to concur in the fine opinion of my good col-
league. I write separately to elaborate my view of one issue,
namely, the appropriate test for identifying and assessing in
First Amendment cases the existence of "a state interest of the
highest order."

When evaluating whether a state's asserted interest rises to
the level shared by those of "the highest order," courts must
consider and weigh heavily the state's expressed views and its
conduct or they risk denuding First Amendment rights. In
*Florida Star v. B.J.F.*, 491 U.S. 524, 537-38 (1989), the Court
explained that Florida's statute failed to further a state interest
of the highest order for three reasons, the first of which was
that the appellant obtained the identifying information in
question from the government in consequence of official mis-
handling of the information. *Id.* at 538. This factor, combined
with the breadth and facial underinclusiveness of Florida's
statute, led the Court to find "no such interest is satisfactorily
served by imposing liability under [the statute] to appellant
under the facts of this case." *Id.* at 541.

Considering a state's view and its actual conduct is particu-
larly important in First Amendment cases like this one, in
which the Commonwealth, a party to the case, undertakes to
punish an individual for re-publishing information initially
published by the Commonwealth itself. In such cases, courts
should not casually treat a "state interest of the highest order"
synonymously with a judicially-noticeable, constitutionally-
rooted, "compelling governmental interest," such as the eradi-
cation of racial discrimination. *See* Maj. Op. at 23. Rather, the
state's dual role as publisher and re-publication punisher
necessitates a more searching analysis of its involvement. For

this reason, while I agree with the observation in the majority opinion that certain evolving "practices indicate a broad consensus that SSNs' public disclosure should be strictly curtailed," Maj. Op. at 27, where, as here, an individual state has not manifested its genuine embrace of that "consensus," then judicially-noticed facts do not trump the state's tangible actions, nor can they render the state's behavior an unimportant or minor aspect of the proper analysis.

Thus, an analysis of a state's view and its actual conduct in furthering its asserted interest is imperative in striking the proper balance, under the First Amendment, between pursuit of "a state interest of the highest order," on the one hand, and, on the other hand, the state's efforts to restrict the exercise of constitutionally-protected expressive activity. This is not to say that "objective" data have no role to play in the analysis of a federal court's assessment of whether an asserted state interest rises to become one "of the highest order." *See* Maj. Op. at 23. But such a consideration should not, and must not, supplant a fact-intensive inquiry into the state's view and its actual conduct in furthering its asserted interest.*

In sum, when a state seeks to punish a speaker for republishing state-published information, the state should be expected, in the words of a contemporary colloquialism, not simply to talk the talk, but to walk the walk, as well. The district court did not err in so concluding here.

---

*Butterworth v. Smith*, 494 U.S. 624 (1990), is not to the contrary. There, the Supreme Court held unconstitutional a Florida statute that prohibited a writer's disclosure of his own grand jury testimony. *Id.* at 626. In so holding, the Court considered whether other states maintain such a rule and whether the Federal Rules prohibited the writer's actions. *Id.* at 634-35. But of course, in *Butterworth*, the state *never* had control of the information in question: the writer's testimony. Thus, the Court had scant reason to consider the actions of the state in safeguarding the information because the state never controlled the information in the first place.